UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

BENJAMIN CONTRERAS, and
RUTH CONTRERAS,

    Plaintiffs,

v.                                                      Civ. No. 10-01091 MV/KBM

CITY OF ALBUQUERQUE,
a Municipal Entity Organized
Under the Laws of New Mexico, and
DAVID TAYLOR, an Officer of the
Albuquerque Police Department, Individually, and
MICHAEL HERNANDEZ, an Officer of the
Albuquerque Police Department, Individually,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment Requesting Dismissal of Counts III, IV, V, and VI of Plaintiff Benjamin Montoya's *[sic]* Amended Complaint, and Memorandum in Support [Doc. 37], and Defendant City of Albuquerque's Motion, and Memorandum in Support, for Summary Judgment Requesting Dismissal of Counts VII and VIII of Plaintiff's Amended Complaint [Doc. 39]. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that Defendants' Motions are both well-taken and will be GRANTED.

## BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiff]" as the party opposing the summary judgment, are as follows.[1] *Cavanaugh v. Woods Cross City*,

---

[1] Although Plaintiff filed a response to Defendants' motion for summary judgment on Plaintiff's constitutional claims against Hernandez and Taylor ("Plaintiff's Response"), he did not submit any evidentiary support for his opposition. Accordingly, all of the facts set forth

625 F.3d 661, 662 (10th Cir. 2010).  On October 6, 2007, Plaintiff Benjamin Contreras's mother, Ruth Contreras, placed an emergency call.  In response to the 911 operator's question, "how can I help you?" Ms. Contreras responded:

> Yes – I need some help.  My son is at his house.  He's – he's bipolar, and he takes medication – and he's called my daughter-in-law, and – he's freaking out over there.  My daughter-in-law's afraid to go home.  And we – really don't want him arrested.  We want somebody – we wanna take him to hospital or something.  Is there some way that you can help me?

Transcript of 911 Recording, Doc. 37-1, at 2:2-6.  Ms. Contrearas further reported that she and her daughter-in-law were at a birthday party, and that Plaintiff:

> kept calling [his wife's] cell phone, and she had it in her purse, and – and when she finally checked it, he kept saying things like – "Every time you don't answer the phone, I'm gonna break something," and "I'm starting to tear up all the pictures."  And, "You better come home in 15 minutes, and don't bring my mother with you."  And – she's afraid to go home.  And he's had some incidents before.  He's taking [Lexipro].

*Id.* at 3:22-4:2.  When the operator asked whether Plaintiff is "known to be violent with officers," Ms. Contreras responded, "He will if they try to handcuff him.  He, he gets very – he get – he has an, anxiety attacks.  And if they try to – handcuff him, . . . he'll freak out."  *Id.* at 5:5-12.  The operator also asked whether Plaintiff "ha[d] any weapons," to which Ms. Contreras responded, "just kitchen utensils."  *Id.* at 4:21-24.  Ms. Contreras told the operator that she wanted to go to Plaintiff's house before any police arrived.  *Id.* at 2:25.  The operator asked for a description of her vehicle, and advised that the police would meet her there shortly.  *Id*. at 5:13-6:9.

In his grand jury testimony, Officer Michael Hernandez testified that he and Officer

---

herein are taken from the evidence submitted by Defendants, with all reasonable inferences drawn in Plaintiff's favor.

2

David Taylor were dispatched to Plaintiff's house "in reference to a domestic violence call." Grand Jury Testimony of Michael Hernandez, Doc. 37-2 at 5:15-16. They initially made contact with Ms. Contreras and Plaintiff's wife, Jill Hutson. *Id.* at 5:17-20. Ms. Hutson reported to the officers that she and her husband had gotten "into a verbal argument over the phone, . . . and he began to vandalize items inside the home, which she could hear through the phone." *Id.* at 5:21-6:1.[2] Ms. Contreras and Ms. Hudson conveyed to the officers that they "were very concerned and were afraid, due to his behavior and past history [of] Bipolar and PTSD," and asked the officers "to go ahead and go into the residence to make contact with them, so they could get either some help – so that it wouldn't further escalate, because they were both scared to go into the home." *Id.* at 6:2-7. Ms. Contreras and Ms. Hudson let the officers into the house. *Id.* at 6:8-9. Hernandez testified that upon entering the house, they observed items "in disarray . . . thrown all over the place, things broken inside the living room." *Id.* at 6:10-13.[3]

Plaintiff was in bed asleep when the officers entered the house. Deposition of Benjamin Contreras, Doc. 37-5, at 194:6-7. The officers entered Plaintiff's bedroom with flashlights. Doc. 37-2, at 6:16-17. Hernandez testified that, upon entering the house, they identified themselves. *Id.* at 6:13-14. Plaintiff, however, testified that he did not know they were officers

---

[2] Plaintiff's Response states: "Plaintiff argues that he never had an argument on the phone with his wife Ms. Hutson. Plaintiff knows he telephoned her on the day in question, however, he has no recollection of what may have been said or if he merely left voice mail messages. He has no recollection of the content of those communications." Doc. 40 at 3. Plaintiff, however, provides no evidence to refute Hernandez's testimony regarding what Ms. Hutson related to him.

[3] Plaintiff's Response states: "As Plaintiff explained in his deposition, he did not 'vandalize' anything. . . . Admittedly, Plaintiff could have been angry and breaking his own property or community property. However that is not vandalism." Doc. 40 at 2-3. Plaintiff, however, does not provide a copy of the relevant portion of his deposition, or any other evidence, to refute Hernandez's testimony of what he saw when he entered the house.

until later in the encounter. Doc. 37-5, at 178:3, 14-18. Plaintiff said to the officers, "Turn off that flashlight." Belt Tape Transcript, Doc. 37-3, at 2:3. One of the officers asked, "How are you doing, Ben," to which Plaintiff said three times, "Get the fuck out of here." *Id.* at 2:2-7. Hernandez testified that, at this point, Plaintiff "stood up and began to charge at [him], and actually swung at [him], hitting [him] on the left side of [his] temple." Doc. 37-2, at 6:23-25. Plaintiff testified: "I don't – I don't remember hitting anybody. I don't remember hitting. I think if anything it would have been like move – jostling." Doc. 37-5, at 179:22-180:1. The belt tape recording demonstrates that later in the encounter, one of the officers stated to Ms. Contreras, "[Plaintiff] socked an officer in the face," and that one of the officers stated to the other, "He socked you good, man." Doc. 37-3, at 9:19-21; 15:14.

Hernandez then "lunged and grabbed ahold of [Plaintiff], and began . . . to give him impact strikes, or knee strikes, in his midsection, or in his abdomen area." Doc. 37-2, at 7:1-4. Hernandez described Plaintiff as "combative," and testified that Plaintiff "was fighting [them] the entire time." *Id.* at 7:2; 9:23. The belt tape recording demonstrates that, at least four times, the officers directed Plaintiff to stop resisting, and to put his hands behind his back, in order to be handcuffed. Doc. 37-3, at 2:12-14, 20-21, 24-25; 3:3; 4:16-18; 5:16-17; 5:25-6:1. The belt tape further demonstrates that, at least five times, the officers warned Plaintiff that they would "tase" him if he did not stop resisting. *Id.* at 2:16-18, 23-24; 4:21-22; 5:19-20; 6:8-9. Plaintiff twice responded that the taser would not work. *Id.* at 3:10-12, 21-22.

Hernandez testified that after Plaintiff refused "several commands," Taylor "deployed his taser," but was unable to handcuff Plaintiff. Doc. 37-2, at 8:21-22. Hernandez then tried to handcuff Plaintiff, and when he was unsuccessful, he, too, tased Plaintiff. *Id.* at 8:10-13. Plaintiff pulled the taser prongs out. *Id.* at 13-14; Doc. 37-5, at 179:20. Hernandez testified that

4

after Plaintiff refused to comply with further commands to place his hands behind his back, "he cycled another taser, shocking him, but he continued to fight through it." Doc. 37-2, at 8:18-21. Taylor then tased Plaintiff again. *Id.* at 8:23-24. According to Hernandez, "at that time [they] were able to cycle another cycle of the taser, and actually [were] then able to place [Plaintiff] into custody." *Id.* at 8:24-9:1.[4] From the belt tape recording, it appears that, during this last "cycle," Hernandez and Taylor both used their tasers on him at the same time. Doc. 37-3, at 15:7-8. It further appears from the belt tape recording that, after the last tasing, Plaintiff was down on the ground, where Hernandez and Taylor handcuffed him, advising, "You are under arrest for battery on a police officer. . . . You hit him when we first came in the room." Doc. 37-3, at 5:25-6:13-16.[5]

Taylor filed a criminal complaint against Plaintiff on October 6, 2007. Doc. 37-4. The Criminal Complaint states, *inter alia,* that Plaintiff "swung at OFC. Hernandez with a closed first, striking OFC. Hernandez in the head near the left temple." *Id.* After Plaintiff's arrest, he remained in jail for approximately two days. Doc. 37-5 at 201:10-11. On January 14, 2008, the District Attorney's Office presented to the Grand Jury charges against Plaintiff. Doc. 37-2 at 2:2-15. The Grand Jury returned an Indictment against Plaintiff, charging him with battery upon a peace officer, conspiracy to commit battery upon a peace officer, and resisting, evading or

---

[4] In his Response, Plaintiff argues that "no one knows how many times Plaintiff was TASED." Doc. 40 at 4. However, Plaintiff provides no evidence to refute Hernandez's testimony and the belt tape recording, which demonstrate that Plaintiff was tased multiple times until he was down on the ground and the officers secured him in handcuffs.

[5] In his Response, Plaintiff argues that there is a factual dispute as to the "timeline" of the encounter. Doc. 40 at 4. However, Plaintiff provides no evidence relating to the sequence of events, and thus nothing to dispute the sequence of events as demonstrated by the belt tape recording and Hernandez's testimony.

obstructing an officer. Doc. 37-6. On February 8, 2008, Plaintiff entered a plea of "not guilty" to the charges. Doc. 37-7.

On October 14, 2010, Plaintiff filed his Amended Complaint for Damages. Doc. 1-1. The Complaint includes two claims under 42 U.S.C. Section 1983 against Hernandez and Taylor, alleging that the officers deprived Plaintiff of his Fourth Amendment rights by (1) unlawfully seizing him without a warrant or probable cause; and (2) using excessive force against him. *Id.* at 10-12. The Complaint also includes three state tort law claims against Hernandez and Taylor: civil battery, malicious prosecution, and false arrest and false imprisonment. *Id.* at 8-10. Further, the Complaint includes two claims under Section 1983 against the City of Albuquerque (the "City"), alleging municipal liability for the constitutional violations committed by Hernandez and Taylor, on the grounds that: (1) the City's policies, procedures and customs were a moving force behind the constitutional deprivations; and (2) the City's failure to train and/or supervise its officers caused the constitutional deprivations. *Id.* at 12-15. Finally, the Complaint includes a negligence claim against the 911 operator who took Ms. Contreras's call, Nicole Breese. *Id.* at 7-9.

On January 28, 2011, Ms. Breese moved to dismiss the claim against her. Doc. 13. On February 17, 2011, Hernandez and Taylor moved to dismiss the three state law tort claims against them. Doc. 15. On May 5, 2011, the Court dismissed the negligence claim against Ms. Breeze and the civil battery claim against the officers, but did not dismiss the malicious prosecution or false arrest and false imprisonment claims against them. Doc. 35.

On July 28, 2011, Defendants filed the instant motion for summary judgment as to Plaintiff's constitutional claims against Hernandez and Taylor, on the basis of qualified immunity, and as to Plaintiff's state law claims against Hernandez and Taylor, on the grounds

that these claims are barred by the statute of limitations.  Doc. 37.  Plaintiff filed his Response on August 10, 2011.  Doc. 40.  Defendants filed a reply on August 29, 2011.  Doc. 45.  On July 29, 2011, the City filed the instant motion for summary judgment on Plaintiff's municipal liability claims against it, arguing that the undisputed evidence does not support either of these claims.  Doc. 39.  Plaintiff did not file a response to the City's motion.

## DISCUSSION

I.       Plaintiff's Constitutional Claims Against Hernandez and Taylor

Defendants seek summary judgment on the basis of qualified immunity as to Plaintiff's Fourth Amendment claims of unlawful arrest and excessive force.  The affirmative defense of qualified immunity arose to address the fact that, "[a]lthough actions for damages provide an important remedy for individuals injured by governmental officials' abuse of authority, such actions sometimes subject officials to costly and harassing litigation and potentially inhibit officials in performing their official duties."  *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001).  To balance these competing interests, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law.' *Id.* (citation omitted).  Qualified immunity affords "broad protection, . . . giving officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery."  *Id.*  (citation omitted).  Thus, "courts should resolve the purely legal question raised by a qualified immunity defense at the earliest possible stage in litigation."  *Id.* (citation omitted).

In keeping with the purposes of qualified immunity, "special rules apply when an official raises a defense of qualified immunity on summary judgment."  *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993).  Specifically, "qualified immunity requires a two-step sequence."  *Morris v. Noe*, __ F.3d __, 2012 WL 604170, *3 (10th Cir. Feb. 27, 2012) (citation

omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citation omitted). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross*, 245 F.3d at 1156. On the other hand, if the plaintiff meets his burden, "the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Id.* (citation omitted). Although the Court views the evidence in the light most favorable to the nonmoving party, "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Id.* The Court conducts the two-step qualified immunity inquiry for Plaintiff's unlawful arrest and excessive force claims separately. *Morris*, 2012 WL 604170, at *3.

  A. <u>Unlawful Arrest</u>

Unlawful arrest claims "are based on the settled proposition that a government official must have probable cause to arrest an individual." *Id.* at *4 (citation omitted). "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." *Id.* at *5. "The probable cause inquiry is an objective one." *Id.* "An arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as the circumstances, viewed objectively, justify the arrest." *Id.* Accordingly, "an arrest is lawful as long as probable cause exists for *some* offense." *Id.* (emphasis in original).

  Neither party has identified the exact moment at which Plaintiff was arrested. Plaintiff

certainly was "seized within the meaning of the Fourth Amendment," no later than when the officers brought him to the ground and placed handcuffs on him. *Id.* at *4 (citing *Brendlin v. California*, 551 U.S. 249 (2007) ("A person is seized by the police . . . when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement by means intentionally applied.")). Arguably, Plaintiff was "seized" earlier, when Hernandez first used his taser gun on him. *Cavanaugh*, 625 F.3d at 665 ("Although Tasers may not constitute deadly force, their use unquestionably 'seizes' the victim in an abrupt and violent manner."). Assuming, *arguendo*, that Plaintiff was seized with the first deployment of the taser, the record demonstrates that, at that point in the encounter, he had told the officers three times to "get the fuck out of here," and had charged at Hernandez, swung at him, and hit him on the left side of his temple. Plaintiff has provided no evidence to the contrary. While Plaintiff's testimony establishes that he does not remember hitting anybody, it does not refute Hernandez's testimony, corroborated by the Criminal Complaint and the belt tape recording, that Plaintiff hit him. Accordingly, Plaintiff's inability to remember hitting anybody is insufficient to create a factual dispute. Similarly, Plaintiff's speculation that, *if* he had caused a physical altercation, it probably would have been only "jostling" is not evidence sufficient to refute Hernandez's testimony.

Based on the record, the facts at the time of Plaintiff's arrest supported probable cause for the state offenses of battery upon a peace officer and resisting, evading or obstructing an officer. The elements necessary to prove battery upon a peace officer are: (1) Plaintiff intentionally touched or applied force to Hernandez by hitting him; (2) At the time, Hernandez was a peace officer and was performing the duties of a peace officer; (3) Plaintiff knew Hernandez was a peace officer; (4) Plaintiff's conduct caused either an actual injury to

Hernandez, an actual threat to his safety, or a meaningful challenge to his authority; and (5) Plaintiff acted in a rude, insolent or angry manner. NMRA, Crim. UJI 14-2211. Similarly, the elements necessary to prove resisting, evading or obstructing an officer are: (1) Hernandez and Taylor were peace officers in the lawful discharge of their duties; (2) Plaintiff knew the officers were peace officers; and (3) Plaintiff resisted Hernandez and Taylor in the lawful discharge of their duties. NMRA, Crim. UJI 14-2215. Under the totality of the circumstances, a reasonable person in the officers' position would have believed that Plaintiff committed both of these offenses. Specifically, by cursing at the officers and hitting Hernandez when they were attempting to talk to him in response to the emergency call placed by Ms. Contreras, Plaintiff: (1) intentionally touched or applied force to Hernandez in a rude, insolent, and angry manner, while Hernandez was performing his official duties, causing, at least, a meaningful challenge to his authority and an actual threat to his safety; and (2) resisted the officers in the lawful discharge of their duties.

Although Plaintiff testified that he did not know Hernandez and Taylor were peace officers until they handcuffed him, a reasonable person would have believed that Plaintiff knew Hernandez and Taylor were peace officers when he cursed at them and hit Hernandez. The officers identified themselves when they entered the house, and Plaintiff did not, at any point, question who they were. Accordingly, Plaintiff has failed to demonstrate that his arrest was invalid under the Fourth Amendment.

  B. <u>Excessive Force</u>

"Excessive force claims are governed by the Fourth Amendment's 'objective reasonableness' standard." *Morris*, 2012 WL 604170, at *6 (citation omitted). Under this standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the

facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). In determining whether the use of force is reasonable in a particular situation, the Court considers (1) the severity of the crime at issue; (2) whether the subject poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee. *Id.* at 396. The Court judges the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Accordingly, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Under this standard, Plaintiff has failed to demonstrate that the conduct of Hernandez and Taylor was objectively unreasonable under the circumstances, and, therefore, in violation of his Fourth Amendment rights. The first two criteria weigh in favor of Plaintiff's claim that the officers' use of force was constitutionally excessive. *See Hinton*, 997 F.2d at 781. Although a domestic violence call is serious, here, the information relayed to the officers was that Plaintiff was home alone, and that the extent of his conduct had been leaving harassing voice mail messages on his wife's cell phone, and breaking or tearing up items in their home. Ms. Contreras called 911 not so much to report a crime that had been committed, but rather to request that the officers accompany her and Ms. Hutson home, essentially to prevent the possible commission of violence or crime. Further, when the officers arrived at Plaintiff's residence, Plaintiff was alone, asleep in his bedroom, with no weapons. Accordingly, "it is difficult to maintain that [Plaintiff] constituted any type of immediate threat to the police [who outnumbered him two to one,] or the public." *Hinton*, 997 F.2d at 781.

"However, the third *Graham* criterion of resisting arrest strongly supports a finding that [the officers'] use of force was objectively reasonable." *Id.* In *Graham*, the Supreme Court noted that the Fourth Amendment recognizes the right of the police, in making an arrest or a stop, "to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Here, the officers' use of force was "clearly commensurate with the level of resistance offered by [Plaintiff]." *Hinton*, 997 F.3d at 781. The record demonstrates that, in response to the officers' attempt to talk to Plaintiff, Plaintiff told them to "get the fuck out of here," and struck Hernandez. Only after Plaintiff displayed that level of resistance did Hernandez lunge and grab Plaintiff, giving him "impact strikes, or knee strikes" in his abdomen area. Plaintiff, however, fought the officers' attempts to restrain him, and refused the officers' commands. In their effort to handcuff Plaintiff, the officers increased their application of force, using a taser on him several times and wrestling him to the ground, where they ultimately handcuffed him. The officers' escalation of violence was preceded by the instruction to stop resisting and to put his hands behind his back. Similarly, the officers warned Plaintiff at least five times that they would "tase" him if he did not stop resisting. Plaintiff responded that the taser would not work, and at one point, pulled the taser prongs out. Finally, there is no evidence that the officers continued to apply force after securing Plaintiff in handcuffs. Under these circumstances, the officers' use of force was not constitutionally excessive. *See id.* (wrestling subject to ground and using a taser on him "numerous times," was not excessive force, where subject was "actively and openly resisting" officers' attempts to handcuff him, and officers ceased using taser once he was in handcuffs); *see also Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (where subject was hostile, belligerent and uncooperative, use of taser gun to effectuate arrest "was reasonably proportionate to the difficult, tense and uncertain situation" officer faced); *Pickering v. City of*

*Okla. City*, No. CIV-06-466, 2007 Wl 2693171, *2-3 (W.D. Okla. Sept. 11, 2007) (use of taser gun four times was not excessive force, where subject "was at most intermittently compliant with [officer's] commands during the entire episode" and "undeniably, actively and openly resisted arrest by refusing to let [officer] handcuff her left arm," and officer discontinued use of the taser gun "once he succeeded in handcuffing her").

Without question, this case is one in which, "[w]ith the benefit of hindsight, one might have hoped for a different resolution." *Mecham v. Frazier*, 500 F.3d 1200, 1205 (10th Cir. 2007). An arrest effected by the use of physical force was not what Ms. Contreras envisioned when she called 911 seeking assistance with her son. Ideally, our community's emergency response services should be better equipped to handle calls such as hers. Nonetheless, the Court's role here is limited to determining the objective reasonableness of the officers' actions under the circumstances with which they were presented. Under that standard, the Court finds that the amount of force used by Hernandez and Taylor was reasonable and commensurate with the level of resistance offered by Plaintiff.

II.     Plaintiff's Municipal Liability Claims Against the City

The Complaint includes two claims under Section 1983 against the City, alleging municipal liability for the constitutional violations committed by Hernandez and Taylor, on the grounds that: (1) the City's policies, procedures and customs were a moving force behind the constitutional deprivations; and (2) the City's failure to train and/or supervise its officers caused the constitutional deprivations. Doc. 1-1, at 12-14. Both of these claims seek to hold the City liable because of the actions of its individual officers. *Id.* The City argues that it is entitled to summary judgment on these claims. Plaintiff did not respond to the City's motion.

Plaintiff's failure to file a response in opposition "constitutes consent to grant the

motion." D.N.M.LR-Civ. 7.1(b). Plaintiff's failure to file a response, however, "is not, by itself, a sufficient basis on which to enter judgment against [Plaintiff]." *Reed.v. Bennett,* 312 F.3d 1190, 1195 (10th Cir. 2002). Rather, this Court "must make the additional determination that judgment for [the City] is 'appropriate' under Rule 56." *Id.* "Summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Id.* "By failing to file a response within the time specified by the local rule, the nonmoving party waives the right to respond or to controvert the facts asserted in the summary judgment motion." *Id.* Accordingly, this Court accepts "as true all material facts asserted and properly supported in the summary judgment motion." *Id.* Nonetheless, the Court may grant summary judgment "only if those facts entitle the moving party to judgment as a matter of law." *Id.*

In the context of a claim for municipal liability under Section 1983, it is well-settled that "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton*, 997 F.2d at 782. Here, the Court's finding that the conduct of Hernandez and Taylor did not violate Plaintiff's Fourth Amendment rights precludes the imposition of any liability against the City. *See id.* Accordingly, the Court concludes that the material facts asserted and properly supported in the City's summary judgment motion entitle the City to summary judgment in its favor. *See id.*

III.     Plaintiff's State Law Claims of Malicious Prosecution and False Arrest and False Imprisonment

There are two state law claims remaining in Plaintiff's Complaint: malicious prosecution and false arrest and imprisonment. Defendants argue that, based on the undisputed facts, these claims were filed after the applicable limitations period had expired, and that summary judgment

14

on these claims thus is appropriate.  As noted above, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).

It is undisputed that Hernandez and Taylor were public employees of the Albuquerque Police Department, a subsidiary agency operated by the City.  *See* Doc. 1-1, ¶¶ 7-8.  Plaintiff's claims of malicious prosecution and false arrest and imprisonment thus are subject to the two-year statute of limitations set forth in the New Mexico Tort Claims Act ("NMTCA").  N.M. Stat. Ann. § 41-4-15A (1978) ("Actions against a governmental entity or a public employee for torts shall be forever barred, unless such action is commenced within two yeas after the date of occurrence resulting in loss, injury or death.").

In connection with his malicious prosecution claim, Plaintiff alleges that on October 6, 2007, Hernandez and Taylor arrested Plaintiff, and that these arrests initiated felony criminal proceedings against him "without legal justification."  Doc. 1-1, ¶¶ 46-49.  "A cause of action for malicious-abuse-of-process accrues immediately upon the improper use of process."  *Mata v. Anderson*, 685 F. Supp. 2d 1223, 1254 (D.N.M. 2010), *aff'd*, 635 F.3d 1250 (10th Cir. 2011).  Specifically, under New Mexico law, "a claim for malicious abuse of process does not require a favorable termination before a plaintiff brings the claim, and the state statute of limitations begins to run as soon as the plaintiff knows of the facts on which he or she is basing the claim."  *McDow v. Gonzales*, No. CIV 07-1266, 2008 WL 5979833, *14 n.5 (D.N.M. Sept. 30, 2008), *aff'd*, 330 F. App'x 765 (10th Cir. 2009).  Here, the undisputed evidence establishes that the Criminal Complaint was filed against Plaintiff on October 6, 2007, an Indictment was returned

against Plaintiff on January 14, 2008, and Plaintiff entered a plea of "not guilty" to the charges on February 8, 2008. Accordingly, the improper use of process began on October 6, 2007, and, by February 8, 2008, when he pled not guilty to the Indictment, Plaintiff knew of the facts on which he bases his malicious prosecution claim. Plaintiff, however, did not file his original complaint in this action until October 4, 2010, two years and eight months later. *See* Doc. 2-1. For this reason, Plaintiff's malicious prosecution claim against Hernandez and Taylor is barred by the NMTCA's two-year statute of limitations. Summary judgment in favor of Defendants on this claim thus is appropriate.

In connection with his false arrest and false imprisonment claim, Plaintiff alleges that, on October 6, 2007, Taylor and Hernandez caused Plaintiff to be arrested without adequate legal justification. Doc. 1-1, ¶ 52. For a claim of false arrest and false imprisonment under New Mexico law, the statute of limitations beings to run "only when the imprisonment ends." *Gose v. Bd. of County Comm'rs of County of McKinley*, 727 F. Supp. 2d 1256, 1264 (D.N.M. 2010). Here, the undisputed evidence establishes that Plaintiff was arrested on October 6, 2007, and remained in jail for approximately two days. Assuming Plaintiff was released from jail on or about October 8, 2007, Plaintiff had until October 8, 2009 to file his claim. As noted above, however, Plaintiff did not file his original complaint in this action until October 4, 2010. *See* Doc. 2-1. For this reason, Plaintiff's false arrest and false imprisonment claim against Hernandez and Taylor is barred by the NMCTA's two-year statute of limitations. Summary judgment in favor of Defendants on this claim thus is appropriate.

## CONCLUSION

Plaintiff has failed to establish that Hernandez and Taylor violated his Fourth Amendment rights, and thus Hernandez and Taylor are entitled to qualified immunity. The fact

that there was no underlying constitutional violation precludes the imposition of municipal liability against the City. Finally, Plaintiff's claims of malicious prosecution and false arrest and false imprisonment are barred by the applicable statute of limitations.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment Requesting Dismissal of Counts III, IV, V, and VI of Plaintiff Benjamin Montoya's *[sic]* Amended Complaint, and Memorandum in Support [Doc. 37], and Defendant City of Albuquerque's Motion, and Memorandum in Support, for Summary Judgment Requesting Dismissal of Counts VII and VIII of Plaintiff's Amended Complaint [Doc. 39] are **GRANTED**.

DATED this 28th day of March, 2012.

_____
MARTHA VÁZQUEZ
United States District Court Judge